Case number 418-0506, and it is entitled Cooley v. Central Illinois Allergy & Respiratory Services, Ltd. We'll show for the appellant, we have Mr. Bresney, Ms. Cyphers, and Mr. Sisko, is that correct? And Mr. Bresney will be arguing. Then for the appellant, we have Mr. Cole, is it Cole or Coley? Cole. Okay, that's what I thought. Mr. Cole and Mr. Hughes, and Mr. Cole is arguing. Yes. You may proceed, counsel. Thank you, Your Honor. May it please the Court, counsel. Your Honor, as you know, my name is Todd Bresney, and I represent the appellant, Clayton Matthew Cooley, along with my colleagues, Ms. Gina McCoy, Ms. Cyphers, and Ms. Sisko. We are here today because we are asking this Honorable Court to take under advisement and consideration to reverse and remand the trial court's denial of our motion for a new trial, and alternatively, a motion to reverse and remand the order of the trial court to grant or deny the JNOB that we requested. These motions are based upon six separate issues, the first of which is that the trial court abused its discretion in not granting a new trial to the plaintiffs because the defendants admitted alteration of a key piece of evidence, namely the medical chart. There are over a thousand medical malpractice cases filed in this state every year, and oftentimes medical malpractice, as opposed to other types of cases, depend entirely upon the integrity and the truthfulness and the veracity of the medical chart. Counsel. Yes, Your Honor. Sorry to interrupt you, but let me ask you this. Of the six issues that you raised, were they all raised in the trial court? Were there objections made related to those issues? I believe so, Judge. The alteration in both these, all of these issues were raised in post-trial motions that were considered by the trial court. The alteration of the medical chart in this particular case involves a case of a child and his treatment, and then as a man he came to me and we filed a lawsuit years later. And to give you some background, because I think it's very hard to put this down in writing, but to give you some background just very briefly, I will say that the chart when it was originally disclosed in 2009 consisted of basically a form, and if Your Honors would, you know, allow me or indulge me, I do want to reference a couple pages of the record just for demonstrative purposes to make it easier. If that's okay. We do so, Counsel. And I'm referencing page C-512 of the record, and what Your Honors can see is most of the chart consisted of one page forms where there was two days of treatment. One at the top, one at the bottom. And the rest of the form would be checkmarked or filled in by hand. And this notation, which was the majority of the chart that was tendered to us in 2009, was illegible. And curiously, there were treatments that were typed and transcribed towards the end of the treatment of the 10 years. And I have some questions about that. Yes, Your Honor. So I made a note that in October of 2010, even though you're saying 2009, so correct me if I'm wrong, that 33 pages of handwritten notes were provided. There were later additional records. So that's not the beginning of it? I believe that's the supplement that we got. Okay. Because then I showed that after that, a motion was filed asking that those handwritten notes be typed up. Then, Your Honor, you're correct. That's the initial tender of the medical chart. Okay. And so that motion was granted. Correct. And those 33 pages were typed up. Correct. Okay. And then in April of 2011, the records were supplemented and they were provided for December 2002 through June of 2003. So my question is, did that original 33 pages of handwritten notes include the notes included in the April 2011 supplemental disclosure? The April 11 supplemental disclosure were the original handwritten notes. That were ordered to be typed up? When the original disclosure was made of the file, we were given typed up transcripts. So we weren't given these original notes. These original notes that were the supplement were somehow found and then tendered a year or so later. So these were the last six months of treatment, which is ironically what Dr. Paul admits to causing the Cushing Syndrome. So when we were provided those, that isn't the only iteration then of the full file. We now have a transcription so we can read the illegibilities and we can understand the shorthand. But we gave those to our experts and all the doctors that testified about the care and treatment relied on the typed transcriptions that were provided by Dr. Paul. We were also given an iteration of the chart in over 1,200 pages of medical records that was kind of buried from SIU Medical Center in response to a subpoena. And the significance of those records wasn't, and I will say right now in open court, wasn't understood until the middle of jury trial, unfortunately. And I have stated this. And what those records were was another complete iteration of the handwritten version. There were no typed written reports there. It was all handwritten. And so as I go through this, I want your honors to understand that after we got the transcripts, that was the whole basis of the nine or eight years of litigation. That was the whole basis of expert disclosures. That was the whole basis of our case and our prosecution and of the defense. Because nobody could understand Dr. Paul's shorthand or illegitimate handwriting. So during the 1 a.m. the day before the morning of Dr. Paul's testimony and trial, it occurred to me that looking at the typed written transcriptions next to the handwritten, I could actually decipher his notations. And I noticed a certain notation for wheezing, for instance, and it was consistent. But before me, I noticed that there were alterations. There were changes. And I go through great detail and I explain all the alterations, the whole 69 of them, in the file. And they all, coincidentally, were in the last six months of treatment, which again Dr. Paul attributed to the steroid provisions or administrations he gave that caused the Cushing syndrome. So, counsel, by what date did you have all of this information? I know you're telling us about what you discovered during trial. But by what date did you have all of this information? I had the SIU version of the records and Dr. Paul's transcriptions and Dr. Paul's original chart before jury trial judge. How long before? I can't tell you with any degree of certainty. It was at least within a year. I did have them. So is that relevant to our analysis when we're trying to determine was there a violation? And if so, what's the appropriate remedy for the violation? With all due respect, I don't think it is relevant. And I'll tell you why. Because the veracity and truthfulness of a medical chart has been upheld so much over the last few years that our Illinois rules of evidence have adopted the fact that these records can be admitted as a due course in court without even laying a foundation through a witness. And so when we have the veracity of a medical chart and we have on top of that the obligations of not only the parties to answer under oath in written discovery and in oral discovery, but also of the attorneys signing documents pursuant to 137, what we have is we have a basis and foundation in our whole civil justice discovery system of telling the truth, of truthfulness. And so when we have this system, you're right, I've never professed ever in my life that I am a good lawyer. But the fact of the matter is, maybe another lawyer would have caught it sooner. But the fact of the matter is, just like an individual on the street does not have to assume that somebody is going to commit negligence and run them down, a lawyer shouldn't have to assume that somebody else has altered material evidence in a case. And I don't think there's a case that Illinois Supreme Court history or Illinois Appellate Court history has ever stood for that proposition. In fact, it's just the opposite. The bar is very low. And we've cited all the cases. When experts don't disclose how many cases they've testified in, there's a new trial. When very, very low standards of discovery, when not applicable was answered, when the defendant, it was found out, had his insurance policies and his possession in control, a new trial was granted. And this is the standard. This is the standard by which I think this appellate court should judge this material alteration, because when we have an eight-year litigation and a two-week jury trial, and of this magnitude and this complexity, and we find out right or wrong, we find out in the middle of it that the record, the whole basis and foundation of the case before the jury has been altered, changed, manipulated by the defendant, how can we get a fair trial? How can the jury, even if, as counsel says in their brief, it turned into a trial of perjury, it turned into a trial of me putting the credibility of the witness on trial, and they're right, because that's all I had. That's all I had. That's all I could do. But that, as our law says, is not substantive. That can easily be conflated and confused by a jury who thinks that, of course, what the law is, that I have to prove malpractice, not lie. So how do I prove? How does my client get a fair and just and equitable trial when there are 69 alterations, admittedly, that make the doctor look better every single time or make the plaintiff look sicker than he was or changes the medication administration, which is the whole basis of the case? These were admitted alterations, and the fact that I have them in my possession, I submit, respectively, doesn't make it good disclosure. The second issue that we brought up is cumulative evidence, and in this case, the defense brought up Dr. Wettner and Dr. Wolfe, both immunologists, both allergists, one from the University of Chicago, one from Washington University, State University, or University of Washington, rather. And both of them had disclosures that exceeded 65. Both had identical disclosures of 44 verbatim in their 213 disclosures. Both of them gave opinions over my objection to the standard of care. Identical. Both of them helped the defense argue that, well, in this case, the defendant, doctor or clinic, did not commit malpractice. And I think that the rule is pretty clear. The defense cites the Taylor case. However, the Taylor case very specifically draws the distinction that in that case, we have two defendants, and each defendant is entitled to their own defense. And just because this defendant calls an expert that's the same as the other defendant doesn't mean it's cumulative. And that's the distinction of Taylor. In this case, we have one defendant calling identical experts to say identical things. And I'm sure that there's going to be some argument over parsing exactly how they said it, but the fact of the matter is, is that both experts came in and testified that the doctor did not commit malpractice or the clinic didn't commit malpractice. And just for clarification, I keep referring to Dr. Paul and the doctor. He was a defendant, but when it was admitted to agency at trial, we dropped Dr. Paul and went against the corporation. Issue number three, 213, Objections and Opinions Outside the Scope. We lay out the opinions on peak flow meters, usefulness, an ER visit that my client had in 2001, and testimony about Matthew's weight, which is a significant part of the case. As weight was a defense that he was going to be obese anyway, was the main defense. I made objections throughout the course of the trial, and I believe that those weren't weighed. I believe those are adequately cited in the record. Because of the history of 213 disclosures and the importance of those, I think that those mandate a new trial for allowing the doctors to testify to those undisclosed opinions. I'm going to go directly to issue number four, and four ties in with one. Four, again, is an abusive discretion standard. Four involved missing notes and a missing weight record, and I want to start with the weight record. The weight record, which I'll cite to as record E467, attached to our brief, was on a little note. How this was found, it was never disclosed in discovery, even though it was attached physically to the inside jacket cover of the medical chart, was that it was found right before Dr. Zimmerman, the very last witness, the star expert witness for the defense, took the stand, he's an endocrinologist. It was found because, justices, I had decided at that point I better not leave anything else up to chance now that I found the disparagements and the alterations of the medical chart, and I started looking through these a few moments before trial because the original file was there by Rule 237. And what I found was that in Dr. Paul's hand, and this hasn't been disputed, was a list of ages and apparent weights that Dr. Zimmerman acknowledged. And why is this important? Counsel argues, well, this is an inadvertent disclosure, an anticipation of litigation. There is no evidence to say that. Dr. Paul never took the stand and said that. There is no evidence that that's what this is. What this is is a nondisclosed notation system of weights associated with Matthew Pooley that far and wide surpassed the time that he treated with Dr. Paul, up until age 20. And why are they significant? Because the very first weight that he writes down is not the weight that is in the medical chart. It's not the weight that is in the medical chart, and wasn't the weight that their own endocrinologist used as the starting weight. Why is that important? Because their star witness comes in and throws up a chart and agrees that these are different weights than the weights he used, and he was charting and extrapolating and saying that Matthew would have been obese anyway, regardless of the corticosteroids. And what this shows to me, in addition to all these other abnormalities and anomalies, is motive of writing a defense. And I want to tie this to the other omissions I forgot to tell you about the SIU chart. Before you do that, do we know whose writing is on that post-it note? This writing was identified, I believe, by Dr. Zimmerman as looking like Dr. Paul's. And it was in the original medical file. And it was, as you can see, underneath another page that had to be folded up to see it. What we have, and counsel and their brief judge stated that it was made in anticipation of litigation, so they admit it was Dr. Paul's writing. What we have at SIU are omissions, records that were never disclosed to us by Dr. Paul. And the most glaring record was the very first visit in 1994. In 1994, in November, and it's part of the PowerPoint presentations, Your Honor. It's a handheld record. And as you see at the top, there are various indications of the types of examinations that will have been performed if they're checked. That means that they were performed. Well, the SIU record on that date has no checkmarks of any exams being performed. The SIU record of that date has no diagnosis or shorthand in the diagnosis section. The original medical file at court in blue ink had a diagnosis and checkmarks. In other words, in ink, evidence was added at some point after that record was disclosed to SIU. And that was given to the jury. Each juror got to hold it and look at it and see the SIU record on the board. Why does Dr. Paul change 1994? Because one of the few, if only, weight that was given of Matthew was in that very first visit. Not in that record, Mike. Not where it should be written. But in another type form that went along with that date. And when I asked Dr. Paul in the stand, and this is part of the record, what did you write in the diagnosis section? He couldn't answer, or he refused to answer, saying he couldn't read his own handwriting. The other omissions that we got. One of the big defenses in this case was that Matthew's collapsed middle back wasn't caused by osteoporosis. That was the generator that his parents finally took him out of Dr. Paul's care and sent him to another doctor. That was their defense. And this is record 512, I believe. It was found in the SIU records. It was dated May 19, 2003. This form has Dr. Paul's writing that acknowledges that he had compression fractures in his mid-back. An x-ray that was taken. An admission against interest. That wasn't disclosed before. Also, were other records, and again, this is demonstrated by exhibit 512. I won't pull them all up. But there was indication of another date below that he was supposed to come and see, but he canceled. But you'll see there are checkmarks of examinations being performed of a date that Matthew didn't even appear on. So again, these omissions are important because the medical chart is all my client had to prove that his condition was caused by an aneurysm. So these omissions, the medical chart, go into our issue number four, as well as Dr. Zimmerman's records. Dr. Zimmerman was their last witness. He's the endocrinologist. And Dr. Zimmerman told me in his deposition years before that he had made four notes, and they were filled with calculations that he did as an endocrinologist. And at his deposition, we cited to the record. I said, will you give those to Charlie Hughes? He said, yes. And I asked for them. And of course, they were requested in written discovery. They were never tendered to me. So the very first day of trial, our motions in limine, the day before, whenever that was, we filed a motion to bar Dr. Zimmerman. And that motion was kicked down the road for a whole week until the day Dr. Zimmerman was going to testify. And on that day, defense counsel walks in and drops another stack of brand-new notes in front of me, not including the calculations. And these notes were subject to voir dire. Counsel, I'm sorry you're out of time. You are in for red light there. Oh, I'm sorry. And the yellow warns you that you're getting close, but you'll have additional time on rebuttal. Thank you, Judge. And I'll just defer to my brief on the other arguments. Thank you. Mr. Cole. Can I please support, counsel? I'm Brett Cole. And along with Charlie Hughes, I represent Central Illinois Allergy and Respiratory Services Limited, who I will more often than not refer to as Dr. Paul because he is that entity's principal owner and was responsible for the care and treatment issue in this case. We ask you to affirm the judgment of the trial court in this case. Before I begin, I want to say thank you to the court for its accommodation regarding scheduling and moving this hearing. I appreciate it, and Mr. Hughes appreciates it. I believe that the record and the briefs tendered demonstrate that there's a fundamental disagreement between the parties as to what issues were presented and what issues were proven at trial. The facts are that this was a case involving nine years of treatment of a young boy for severe asthma exacerbations. And 23 years after those occurred, some of the treatment occurred. We were standing in trial and recalling what happened 23 years prior. The plaintiff has framed this case in terms of the result as far as the merits of it are concerned. Cushing syndrome, osteoporosis were caused by Dr. Paul's treatment. That's what the plaintiff claims. Over the issues at trial, did Dr. Paul deviate from the standard of care and did he cause injury to the plaintiff? The jury's verdict was that he did not. It was a general verdict. The jury might have believed he didn't deviate from the standard of care. The jury might have believed he didn't cause injury. The jury might have believed that there were no damages. This court should not disturb that verdict in this case. On appeal, the issues are whether the trial court abused its discretion in denial of the plaintiff's motion for a new trial and whether the jury's verdict was against the manifest weight of the evidence. With regard to the plaintiff's motion for a new trial, the plaintiff has claimed several bases, nondisclosure under Rule 213, presentation of cumulative evidence, allegedly perjured testimony, and the wrongful retention of a juror. The plaintiff has not demonstrated an affirmative showing of an abuse of discretion by the trial court with regard to any of these issues. And the record demonstrates that Judge Bells was careful and deliberate with respect to all of these issues that were presented to him. The jury's verdict was not against the manifest weight of the evidence, and there is no basis to claim that the evidence at trial was so overwhelmingly supportive of the plaintiff's case as to render a judgment notwithstanding the verdict appropriate. Counsel, are you contesting the allegation that the medical records were altered? Yes. So you dispute that? Yes, we do. Okay. And opposing counsel indicated that you admitted that the posted note was Dr. Paul's writing. Is that accurate? That is accurate. Okay. Tell me why you're disputing the allegation that the medical records were altered. Well, what occurred is there are really three sets of records at issue. There's the handwritten record, and then there's records that were transcribed and sent to later providers, who Mr. Bresnik has referred to as SIU. And then there are transcribed records that were transcribed at the behest of the court to aid plaintiffs in reviewing the case. Dr. Paul offered fairly significant testimony on cross-examination regarding the differences in those records. Did Dr. Paul admit to changing the records, to adding to the records? He did not. He admitted that there were differences in the handwritten charts versus the transcribed records. But those differences came about principally as a function of the transcription system, which was not a verbatim transcription. But instead, Dr. Paul transcribed them as he would in the course of his business when records needed to be transcribed into a form that had fields that auto-populated and populated and things like that. Mr. Bull, could I ask, just using, and I don't have the ones that were referenced earlier by Mr. Bresnik. What I have is from the records C452, 453, and 454. Is this the way it appeared in court, presented to the jury, or how it was exchanged in discovery on December 16, 2002? I believe that that's part of a PowerPoint presentation that the plaintiff played for the jury. Okay, all right. Then never mind that cover page then. The next page, which is C453, bears the handwritten date 12-15-02. And then it's a form and has some handwritten entries in it. And then the following page in the record, C454, has typed on their progress note 12-16-02. In the briefs and during argument here, when reference is made to handwritten notes and then transcribed notes, is C453 an example of the handwritten notes of Dr. Paul? And then C454, is that an example of the transcribed notes from the same date by Dr. Paul? Yes. Okay, so what we're doing is we're looking at what is handwritten here, which arguably there's not much written in the handwritten portion here. And then in the typed version, much more expansive. Is that right? Yes, I would agree with you. Was it ever represented by the defense that these were verbatim transcribed notes such as C454 here? I don't believe that it was. And I believe it's also fairly obvious to anyone looking at the two of them that it's not. I wanted to make sure I understood what I was looking at here, and I appreciate it. I have a question to follow up to that. So when the motion was made to have illegible notes transcribed, is that an example of an illegible note that Judge Harris referred to and then what it would be transcribed into? Yes. So when they asked to have the illegible notes transcribed, when they were transcribed, you had additional information? Based on the form that was used, yes. And I point out that Mr. Bresney in his statements earlier today said that he raised these issues during trial. That is not consistent with the record. It's not consistent with my recollection of the trial. The alterations to the medical record and plaintiff's claims regarding those alterations were not raised during the jury trial. No relief was sought until after the verdict was entered. And these were raised for the first time in a post-trial motion. And the majority of the objections to Rule 213, I might add, also came. So counsel, outline for us, I know you did it in your brief, but outline for us the issues that you are indicating were not raised and therefore forfeited. Yes. Well, there were several 213 objections described. It's easier to outline the 213 objection that was not forfeited, and that was the objection to testimony concerning an emergency department record. And that was considered by, the objection was raised that was considered by the court, both in the presence of the jury and outside the presence of the jury. And the court exercised its discretion with regard to its disclosure, and I believe in my brief I have identified exactly where that opinion was previously disclosed. The defendant's brief answers each and every one of the plaintiffs' claimed 213 violations, with citations to fairly express disclosures of those opinions claimed. I note that the rule allows for the plaintiffs' brief to be disclosed, with logical corollaries to be made, and that gives a little bit of room so that there doesn't have to be a verbatim disclosure. Many of these objections that were made in that brief are almost verbatim disclosed in either the disclosure or the deposition. But the defendants should not be expected to, via their disclosure or via the depositions of their expert witnesses, direct the plaintiff to all possible inferences to be made from the disclosures of that testimony. And when information was disclosed late, such as Dr. Zimmerman's notes, the court engaged in an appropriate analysis and imposed an appropriate sanction. And the record, with regard to Dr. Zimmerman's notes, is, I must say, a fairly exemplary example of the analysis that the Illinois Supreme Court has put forth for discovery sanctions against Sullivan v. Edward Hospital. Judge Bells was concerned about the surprise of this note on the day that the witness was offered his testimony. He was concerned about its prejudicial effect. He was concerned about the nature of the evidence that was being presented, and went to great lengths to make sure that it didn't have anything to do with the direct examination. He was also concerned about the plaintiff's diligence, which in this case, with regard to Dr. Zimmerman's note, is, I'll admit, the plaintiff diligently sought that note. It sought Dr. Zimmerman's information. I did as well. It didn't manifest until the day he was offering testimony. There's also the timeliness of the objection. That objection was timely. And Judge Bells considered the good faith of the party offering the evidence. And it was made clear in the record that there was not an attempt here to deceive the plaintiff with withholding that note. It was probably a little bit more clear that although Dr. Zimmerman is an expert endocrinologist, he is not an expert in offering trial court testimony. And the shoots and arrows that come with offering testimony as an expert witness, I think were somewhat new to Dr. Zimmerman. The idea of full disclosure of all notes was maybe a little foreign to him, although efforts were made to keep him informed of that. That occurrence is not something that we count as well. And a sanction was given by the trial court, and it was appropriate. Mr. Bresny was afforded the opportunity to extensively cross-examine Dr. Zimmerman about those notes, and the defendant was not allowed to discuss those notes with Dr. Zimmerman on direct. And what's also important is that the sum of Dr. Zimmerman's testimony was that the timing of the manifestation of Matthew Cooley's weight gain was not consistent with the timing of his asthma treatment. And the notes that he took were notes that were taken from the medical chart about dosages given. And his testimony didn't have anything to do with the dosages given. He was talking about the timing of the treatment. The notes were notes he made for his own benefit, and his testimony in that regard is fairly clear. Judge Bell's analysis in that regard is also very clear. And plaintiff has cited the Kubitschek case, appeal from Judge Corey, and I note in paragraph 25 of the Kubitschek case that Judge Corey engages in a very similar analysis in his trial court order regarding issuing a new trial and his reasons for doing that, very similar to what Judge Bell did in his analysis of Dr. Zimmerman's notes when that objection was raised in trial. I note that with regard to that post-it note, no objection was made in trial. Mr. Bresney engaged in some cross-examination of Dr. Zimmerman about the post-it note, but he didn't make any motion to the court about his late disclosure until after the jury verdict came in. And there are very few ways of reading the contents of that note and determining that it is some nefarious medical record-keeping intentionally kept from the plaintiff. Plaintiff was 13 years old when he stopped treating with Dr. Paul, and there's documentation on that note of his weight at age 20. It's not regarding Dr. Paul's care and treatment of this plaintiff, and it was not made when plaintiff was 13 years old. It was made long after the fact in an attempt to keep Dr. Paul's thoughts straight when communicating with his counsel about the development of the case. I want to touch on the cumulative testimony claims that the plaintiff has made. Judge Bell has consideration of the possibility of cumulative testimony in the record. I believe it's at record page 45, and that consideration is exactly correct. He says there's always going to be crossover and duplication among witnesses, but if they are saying literally the same things, it becomes cumulative. And it's fairly obvious that two defense experts would both have the opinion that the defendant complied with the standard of care and didn't cause injury. That's why they were called as defense witnesses. But the plaintiff's view of this testimony is very simplistic. It is not just did Dr. Paul comply with the standard of care. The substance of the testimony is how he complied with the standard of care, why he complied with the standard of care. And Dr. Wedner and Dr. Wolf had very different accounts because they were talking about different treatment periods. Dr. Wedner's account of Dr. Paul's compliance with the standard of care was with regard to a broad range of his treatment. Dr. Wolf zeroed in on those critical six months in 2003. This testimony was not cumulative, and the trial court properly exercised its discretion and allowed it to be presented to the jury. The plaintiff appears to assert that because appellate courts in other cases have affirmed trial court's decisions to bar cumulative testimony, that the inverse should be true, that it would have been an abuse of discretion not to bar the testimony. But I believe that betrays somewhat of a misunderstanding of the abuse of discretion standard. Judge Bell's engaged in analysis of the testimony and its prejudice and whether or not it was Unless the trial court has failed to consider the testimony is cumulative and failed to consider its prejudicial impact on the other party, there is no abuse of discretion. And the plaintiff has not made an affirmative showing of abuse of discretion with regard to cumulative testimony in this case. I want to touch on the retention of Juror Rex Road. Great weight ought to be given to a juror's statement that he or she can be fair and impartial. And that is exactly what Juror Rex Road told the court. Judge Bell spent the better part of an hour investigating the issues surrounding Juror Rex Road. And there was no testimony from anyone that she could not be fair and impartial. She was properly retained as a juror. At any point did the court indicate that it would exclude her? No. I believe that the sequence of events was she eloped from the jury deliberation room and then returned. And with no loss of time. There was no demonstration of prejudice by the plaintiff for her retention either. Even if she was wrongfully retained and she wasn't, it didn't make any difference. With regard to the plaintiff's claim that the decision was against the manifest weight of the evidence, there were numerous deficiencies in the plaintiff's presentation of evidence. Those are cited in the brief, particularly with regard to proximate causation. There was also a motion for directive verdict with regard to some of these issues. And the plaintiff's defense of that motion passed the directive verdict standard. However, the plaintiff's defense of that motion was not that the evidence so favored them that the directive verdict motion was ridiculous. In fact, the evidence did not so favor the plaintiff that a verdict any other way would be against it. Thank you for your time. Thank you, counsel. Any rebuttal, Mr. Bresney? First, with Dr. Zimmerman, the stack of notes disclosed, the counsel said that there was no attempt to deceive and that's not the standard. The stack of notes in the voir dire that followed it with Judge Bells was simply to ascertain how long he had those notes. When were they discoverable? And the record shows that he had had them for months. And as the law in Illinois is, is that if your paid expert has constructed possession of notes of things that need to be turned over, you have constructed possession of those and you have to turn them over. Now, the fact that there was a motion to bar him for not producing the notes he never did disclose, which were the calculations, for almost a week up to that point, it kind of begs the question, why didn't the defense know about these notes? They didn't apparently contact their expert to ask them about the calculations for that whole week that that motion to bar him was pending. So when I got these new notes and we had this voir dire, that's what we crossed him on. And I did not have time, moments before the last witness was called, to spend going through each and every one of these notations of the stack that was given to me to be able to determine and come up with a new cross, the very last witness of the trial. As far as Juror Rexroth goes, this was right before our closing argument. We had multiple, multiple delays of closing argument because of these issues. And the point, in all due respect to counsel, when she abandoned the jury room, contrary to court order, besides the court sheriff trying to stop her, as it was discussed to us, we had no idea where she went. And at that point, we were going to continue with our closing arguments and we had three alternates. But a few minutes go by, I believe it was 5 to 10, and we were called back in. She had come back. Judge had talked to her, said she wants to be a juror. And that's right in a wreck. So, in other words, she wasn't a juror. We were led to believe there was going to be an alternate. So, at that point, she says she's fair. But this is a woman who was emotionally compromised. She was emotionally compromised, right or wrong, because she was accused of saying she was going to be biased. And at that point, being emotionally compromised to the extent that she didn't follow the court order, and she left the jury room, why wouldn't she be supplanted with an alternate? One of three. They had been sitting through the whole trial. So, I believe that there was an abuse of discretion, not intentionally, but an abuse of discretion on the court's part not to be placing her down because of that. As far as the alterations not being raised at trial, there is a whole record that we cited to, about how Judge Bells not only had sent the jury out, but how I was told to disclose to the defense what my intent was about the impeachment. What alterations I was going to bring up. How they were going to be brought up. And Judge Bells meticulously, in the record, went through the SIU records and compared them with what was disclosed to verify that they looked like a copy of the chart. So, I absolutely raised this before the court. And at that point, at the end of the trial, all we had was this evidence.  And thank you for your time in considering that the only remedy for us, in this case, is a new trial in damages only because of the evidence. Thank you, counsel. We'll take this matter under advisement and be in recess at this time.